UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL RICHARDS,   No. C 08-2651 MHP (pr)

    Petitioner,   **ORDER DENYING HABEAS PETITION**

    v.

BEN CURRY, warden,

    Respondent.
                                     /

## INTRODUCTION

Daniel Richards, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Richards was convicted in Los Angeles County Superior Court of second degree murder in 1988 and was sentenced to 15 years to life in prison. His habeas petition does not challenge his conviction but instead challenges a May 2, 2006 decision by the Board of Parole Hearings ("BPH") that found him not suitable for parole.

The BPH identified the circumstances of the commitment offense, the lack of remorse/insight, the mixed psychological report, and the need for additional programming as the reasons for finding him unsuitable.

Richards sought relief in the California courts. The Los Angeles County Superior Court denied his petition for writ of habeas corpus in two reasoned decisions. The California Court of Appeal and California Supreme Court summarily denied his petitions for writ of habeas corpus.

Richards then filed his federal petition for a writ of habeas corpus. The court found cognizable his claim that his right to due process was violated because the evidence was insufficient to support the BPH's decision that he was unsuitable for parole. Respondent filed an answer and Richards filed a traverse.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at a prison in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that

was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Hayward v. Marshall, 603 F.3d 546, 563 (9th Cir. 2010) (en banc); Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.   State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for

1  offenses of similar gravity and magnitude with respect to the threat to the public."[1] The
2  regulation also provides that "[t]he panel shall first determine whether the life prisoner is
3  suitable for release on parole. Regardless of the length of time served, a life prisoner shall be
4  found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose
5  an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §
6  2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal.
7  Code Regs. § 2402(b).

8       The regulations contain a matrix of suggested base terms for several categories of
9  crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix
10 of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,
11 depending on some of the facts of the crime. The statutory scheme places individual
12 suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to
13 ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is
14 not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal.
15 Code Regs. § 2403(a).

16      The "Penal Code and corresponding regulations establish that the fundamental
17 consideration in parole decisions is public safety . . . [T]he core determination of 'public
18 safety' under the statute and corresponding regulations involves an assessment of an inmate's
19 current dangerousness." In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008)(emphasis in
20 source). Where "evidence of the inmate's rehabilitation and suitability for parole under the
21 governing statutes and regulations is overwhelming, the only evidence related to unsuitability
22 is the gravity of the commitment offense, and that offense is both temporally remote and
23 mitigated by circumstances indicating the conduct is unlikely to recur, the immutable
24 circumstance that the commitment offense involved aggravated conduct does not provide
25 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to
26 public safety." Id. at 1191 (emphasis in source).

27 B.    Federal Habeas Relief On Parole Denial Claims
28      The U. S. Constitution's Due Process Clause does not itself provide state prisoners

4

with a federal right to release on parole. Hayward v. Marshall, 603 F.3d 546, 562 (9th Cir. 2010) (en banc). The substantive law of a state might create a right to release on parole, however. See id. at 555, 559. Although Hayward purported not to reach the question whether a California's substantive law created a federally protected liberty interest, see id. at 562, later cases from the Ninth Circuit have said or assumed it does. See Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) ("state-created rights may give rise to liberty interests that may be enforced as a matter of federal law. . . . By holding that a federal habeas court may review the reasonableness of the state court's application of the California 'some evidence' rule, Hayward necessarily held that compliance with the state requirement is mandated by federal law, specifically the Due Process Clause." ); Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) ("In Hayward, we held that due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas review under AEDPA"); id. ("we must examine the nature and scope of the federally enforceable liberty interest created by California's 'some evidence' requirement"); see also Pirtle v. California Board of Prison Terms, 611 F.3d 1015, 1020 (9th Cir. 2010) ("'California's parole scheme gives rise to a cognizable liberty interest in release on parole.' McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir 2002). That liberty interest encompasses the state-created requirement that a parole decision must be supported by 'some evidence' of current dangerousness. Hayward [603 F.3d at 562-63.]")  Hayward's application and these later cases make it clear that in the Ninth Circuit there is federal habeas relief available under § 2254 for California prisoners denied parole without sufficient evidence, although it now appears that the emphasis has shifted from § 2254(d)(1) to § 2254(d)(2).

A federal district court reviewing a California parole decision "must determine 'whether the California judicial decision approving the governor's [or the Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)). That requirement was summarized in Hayward as follows:

5

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post- incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. [¶] Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

Hayward, 603 F.3d at 562 (footnotes omitted) (quoting Lawrence, 44 Cal. 4th. at 1210, 1213-14); see also Cooke, 606 F.3d at 1216 (describing California's "some evidence" requirement).

When a federal court considers a habeas case directed to a parole decision, the "necessary subsidiary findings" and the "ultimate 'some evidence' findings" by the state courts are factual findings – and thus are reviewed by the federal court under 28 U.S.C. § 2254(d)(2) for whether the decision was "based on an unreasonable determination of the facts in light of the evidence." Cooke, 606 F.3d at 1214 (citing Hayward, 603 F.3d at 563).

C.   Richards' Case

    1.   His Circumstances

Commitment offense: The murder was described in the probation officer's report.

> On September 6, 1987 at approximately 9:31 p.m. in the vicinity of 323 Rowan Avenue, East Los Angeles, California, victim Lopez and companion had been walking down the street when they were approached by several people including defendant and co-defendant. One of the people said "what did you say?" in a hostile and provoking manner. Defendant and co-defendant then began to hit and kick the victim and his companion. Victim's brother was being hit and kicked. Defendant and co-defendant were involved in the situation. Someone had a baseball bat and began to hit victims. The victims fell to the ground bleeding. Defendant and co-defendant as well as others ran to 303 North Rowan and others ran to a Datsun B210 which was parked in front of that address. The address was that of co-defendant and he was identified as being one of the culprits involved in the assault. Defendant was also at that address and had what appeared to be fresh blood on his shoes. . . . Also, in the yard was found a baseball bat, rod, and transmission shaft by deputies. Additionally, was found a wooden club and a tooled rod in the street near where the assault took place. The bat was positively identified by one of the victims as the one used on the deceased. The transmission shaft was also identified as a weapon used in the assault.

Pet. Exh. 5, probation officer's report at 2-3.[2] The victim died about nine days later from blunt force trauma to the head which was consistent with being hit with a baseball bat. "A witness to the assault identified the defendant and co-defendant as having hit the victim with

6

1  a baseball bat." Id at 3.  The probation officer also reported that one of the investigating
2  police officers said that "the defendant and co-defendant got into a fight with the victim and
3  appeared to start the fight.  Defendant was observed by a witness to hit the deceased with a
4  baseball bat when he was down.  Defendant was not affiliated with the gang but younger
5  gang members became involved." Id. at 11.

6        The California Court of Appeal's opinion on the original appeal from the conviction
7  stated that one witness testified that Richards attacked victim Reuben Lopez with a metal
8  baseball bat and "swung the bat back and forth, from the left and right, and 'real fast.'" RT
9  16.

10        Richards denied taking part in the beating of the victim.  May 2, 2006 BPH hearing
11  reporter's transcript ("RT") RT 12-19.  He said that the incident started when the murder
12  victim tried to rob him.  When the victim came at him (Richards) to get his chain, Richards
13  hit the victim.  The victim got up and stabbed Richards in the hand and Richards went into
14  "shock" and left the alley.  RT 14-15.  As Richards saw it, his brother and brother's friends
15  came to his rescue.  RT 15.  Richards was cagey as to his brother's role: he said that his
16  brother "was involved" but claimed not to know whether his brother hit the victim.  RT 15-
17  16.  Richards said he "was riding this" – meaning that he suffered the conviction and was
18  serving the sentence – "because that's the way I was brought up.  I'm the oldest and to me you
19  were brought up to look after your family no matter what."  RT 17.

20        The BPH did not believe Richards' denial of responsibility and noted that the jury and
21  court had not believed it.  The district attorney also argued that the police reports showed that
22  Richards initially denied being in any fight and said he had cut his hand the day before while
23  working on a car, and then Richards later changed his story to investigators and said
24  someone named Luis Salice came to the house with a piece of a bat and told him that he
25  (Salice) had killed someone with a bat.  RT 55-57.

26        <u>Remorse, Insight and The Psychological Report</u>: At the hearing, Richards stated that
27  he took responsibility for the crime because he was convicted.  RT 17.  When asked if he had
28  remorse as to what had occurred, Richards said that he did because a man lost his life and his

7

family would never see him again.  RT 19, 53.

The psychological evaluator indicated that Richards' denial of involvement made it difficult to evaluate him.  Petition, Exh. C.  The psychologist wrote: "There is no way to know for certain the circumstances of this case and inmate Richard's (sic) involvement, so the assessment of dangerousness will be based on: 1) Past history.  2) Programming since being incarcerated.  3) His current mental status, and gains made since being incarcerated."  Id. at 3.  Based on this information, the psychologist wrote that "[i]f released to the community, his violence potential is estimated to be no more than the average citizen in the community."  Id.

Vocational Training: At the time of the hearing, Richards' work assignment was as a machine operator, for which he received satisfactory to above-average work reports.  RT 29.  He had received his high school diploma in 1995.  He completed the vocational printing and graphics program in 1998, but otherwise had not completed any other vocational training program.  Id. He did have furniture-making training of some sort.  RT 30.  Upon his release, he planned to seek employment in a floor care business which his parents owned.  RT 33.  He also had other employment options to work in a restaurant owned by an acquaintance. RT 33.

Other information: Richards' disciplinary history consisted of three CDC-115 rule violation reports, the most recent of which was in 1998 for possessing unauthorized materials.  He also had received eleven CDC-128 counseling memoranda for lesser transgressions, the last one of which was in 1995 for possession of another inmate's property.  RT 31, 63.  He also had no criminal history before the murder.  He had participated in self-help and other programming, including some self-help programming since his last hearing.

2.     BPH's Decision And State Court Review

The BPH determined that the "prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released."  RT 70.  The BPH relied on the commitment offense, which was "carried out in an especially cruel and callous manner."  RT 70.  The BPH also relied on the fact that Richards had been in prison

for 19 years and had not upgraded himself vocationally as much as he should have and had done nothing to upgrade since 1998, which was concerning in light of the fact that he had been told to do so at previous hearings. RT 36, 71-72. The commissioner explained that working on these skills would give Richards something to look forward to in terms of employability. "[Y]ou should take advantage of the time that you have here in order to get yourself ready and prepared to go." RT 74. The BPH also relied on the fact that the psychological report was not totally supportive in that the psychologist could not diagnose Richards effectively because he denied committing the crime. RT 73. The commissioner said that Richards' story of being the victim was not believable, and suggested that Richards' failure to take responsibility for the crime showed that he was not progressing in his rehabilitation. RT 75. The BPH recognized that this inmate had numerous positive attributes, but found them not to outweigh the circumstances that indicated he was not suitable for parole.

The Los Angeles County Superior Court upheld the BPH's decision in a reasoned decision. See Resp. Exhs. 1 and 2. As the last reasoned decision from a state court, the second decision from the superior court is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). The superior court found that some evidence did support the BPH's conclusion that Richards was not suitable for parole because he presented an unreasonable risk of danger to society. Resp. Exh. 2. The court described the crime as in the probation officer's report, and noted that Richards offered a different version of the facts. The court found that there was some evidence to support the determination that the commitment offense demonstrated exceptionally callous disregard for human suffering. However, there was not some evidence for the BPH's finding that the motive was very trivial in relation to the offense: the state appellate court's decision did not supply a possible motive, and the prisoner's version would (if believed) provided a non-trivial motive. The state court then wrote:

> The Board also considered the Petitioner's failure to upgrade vocationally and his failure to admit to participating in beating the victim to death. Where guilt is

9

> uncontested, a Petitioner's version of events may be evidence that he lacks remorse. See <u>In re McClendon</u> (2004) 113 Cal.App.4th 315, 322. However, the Board may not require the Petitioner to admit guilt. Penal Code § 5011. The Board's repeated requests that the Petitioner admit to participating in the offense were improper. However, the Board could conclude that the Petitioner lacked sufficient remorse.

Resp. Exh. 2, p. 3. The court stated that the BPH's decision could be upheld despite flaws in its findings if it is clear the BPH would have reached the same decision absent the errors. "Here, it is clear that the Board would have denied parole because the offense demonstrated an exceptionally callous disregard for human suffering and because the Board determined that the Petitioner needs additional programming." <u>Id.</u> There was some evidence to support the BPH's determination. <u>Id.</u>

       3.       <u>Analysis Of Habeas Claim</u>

This case presents the interesting problem of a parole applicant who denies responsibility for the crime. From the prisoner's perspective, he should have no remorse for a crime he did not commit, nor does he need to gain insight into someone else's criminal activities. From the BPH's perspective, that lack of remorse and lack of insight indicate that the prisoner is not rehabilitated. The inmate is not required to admit that he is guilty of the commitment offense. Cal. Penal Code § 5011; 15 Cal. Code § 2236.[3] Although he is not required to admit his guilt, neither the statute nor the regulations require the BPH to accept the prisoner's version of the crime. While that prisoner faces a difficult dilemma, the constitutional question presented does not require that this dilemma be solved for the prisoner by the court.

The conviction itself provides some evidence that Richards committed the murder. The probation officer's report and the evidence at trial (as described in the California Court of Appeal's opinion affirming the conviction) provide some evidence that the murder was especially cruel and callous: there was testimony that Richards killed the victim by repeatedly hitting him with a baseball bat, and even hit the victim when he was on the ground. Parole officials faced with such a record, and faced with an inmate who denies responsibility for the killing, reasonably can conclude that more programming is needed to help him progress in his rehabilitation efforts. The prisoner's refusal to admit guilt of the

murder does not result in him being punished for that refusal, but it also does not work to his advantage. Instead, it results in the BPH having less information on which to base its decision that the prisoner is suitable for parole. With the absence of information about remorse and insight, the other information that *is* available to the BPH may take on greater significance. It may be that in later years, good behavior and extensive programming in custody, as well as reaching an age at which return to criminality is statistically improbable, will be sufficient to show that the inmate is suitable for release regardless of his view of the crime. Here, the record suggested an inmate who was putting in the prison time without serious disciplinary problems but not really progressing in his rehabilitative efforts, as he had done minimal vocational training and little self-help work until quite recently  The information available to the BPH – sans evidence of rehabilitation or remorse – reasonably could indicate "that the implications regarding the prisoner's dangerousness that derive from his . . . commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." Lawrence, 44 Cal. 4th at 1214. Richards' lengthy incarceration and his self-help and therapy programming count in his favor, but it cannot be said that at this point they compel a finding of suitability. Cf. Shaputis, 44 Cal. 4th at 1259-60 (upholding unsuitability determination for prisoner who, despite favorable programming and prison behavior, still had not gained insight into his domestic violence and murder of his wife). There was some evidence to support the BPH's findings on the commitment offense, mental state and need for programming, and those circumstances were probative of and provided reliable evidence of Richards' current dangerousness.  The state court's rejection of Richards' petition was not an unreasonable application of California's "some evidence" requirement and was not based on an unreasonable determination of the facts in light of the evidence. Richards therefore is not entitled to federal habeas relief.

/ / /

/ / /

11

D.    Certificate Of Appealability

A certificate of appealability is GRANTED as to the due process claim. See 28 U.S.C. § 2253(c). Reasonable jurists could find the district court's assessment of the claim debatable. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). Richards is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: September 30, 2010

Marilyn Hall Patel
United States District Judge

# NOTES

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

2.      The ellipses in the quoted passage indicate the deletion of a sentence that stated that the blood on Richards' shoe matched that of the victim.  The sentence is omitted because it may not have been accurate.

        There had been one or more tests on the blood evidence, but the transcript of the 2006 hearing is very confused as to what the results meant because there were multiple perpetrators and multiple victims.  The transcript is clear, however, that Richards' attorney and the district attorney agreed that it had not been established that the blood on Richards' shoe was the blood from the victim.  RT 46.

3.      Section 2236 of Title 15 of the California Code of Regulations provides:

> The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability.  The board shall not require an admission of guilt to any crime for which the prisoner was committed.  A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner.